**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AIRENSURED, LLC, | § | |
| | § | |
| *Plaintiff*, | § | Civil Action No. 4:26-cv-1755 |
| | § | |
| v. | § | JURY DEMANDED |
| | § | |
| BETTERR, LLC, | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**TO THE HONORABLE U.S. DISTRICT JUDGE:**

NOW COMES, AIRENSURED, LLC, Plaintiff, complaining of BETTERR, LLC, Defendant, in this Plaintiff's Original Complaint and for cause of action respectfully shows unto the Court as follows, *to-wit*:

## I. INTRODUCTION

1. This is a cybersquatting and trademark infringement case.

2. AirEnsured, LLC, ("**Plaintiff**") hired Betterr, LLC, ("**Defendant**") to perform online marketing services for it. Defendant encouraged Plaintiff to begin using the service mark MOLD BUSTERS FORT WORTH in Fort Worth, Texas, in connection with Plaintiff's mold abatement services because Defendant had within its possession the unused domain name moldbustersftworth.com, an unused and previously created website and an unused Google Business Profile, all associated with that domain name that Defendant represented to Plaintiff that it could use and own. Further, Defendant encouraged Plaintiff to begin a Dallas, Texas, operation using the service mark MOLD BUSTERS DALLAS. For the Dallas operation, Defendant

registered the domain name moldbustersdallas.com, created a website associated with that domain name and a Google Business Profile, all for Plaintiff.

3. Defendant assured Plaintiff that Defendant would transfer control of these assets (the domain names, the websites and the Google Business Profiles) to Plaintiff.

4. When Plaintiff requested that Defendant transfer control of the assets, including domain names, to Plaintiff, first, Defendant demanded Twenty Thousand Dollars from Plaintiff; then, Defendant demanded Five Thousand Dollars for the Dallas assets but refused to transfer the Fort Worth assets because, according to Defendant, Defendant does not own those assets – contrary to what Defendant originally told Plaintiff.

5. Consequently, Defendant is holding Plaintiff's assets, including domain names, hostage until a ransom is paid. Thus, Defendant is cybersquatting on Plaintiff's domain names.

6. If Defendant does not own the Fort Worth assets, then Defendant made misrepresentations to Plaintiff at the time Defendant began performing online marketing services.

7. Further, after Plaintiff severed its business relationship with Defendant, Defendant has begun using the Plaintiff's service mark MOLD BUSTERS FORT WORTH to advertise and obtain customers in the Fort Worth area in connection with mold abatement services. Thus, Defendant is infringing upon Plaintiff's rights in its service mark in Fort Worth, Texas.

8. Plaintiff is seeking an order from the Court that the domain names be transferred to Plaintiff and that Defendant not be permitted to use Plaintiff's service mark in Fort Worth. Also, Plaintiff is also seeking damages for Defendant's unlawful conduct.

## II. PARTIES

9. AirEnsured, LLC, is a limited liability company duly organized and existing under the laws of the State of Texas, having its principal place of business located in this district.

10. Betterr, LLC, is a Utah limited liability company with its principal place of business at 1042 E Fort Union Blvd, #1149, Midvale, Utah 84047 and may be served with process by delivering a copy of the Summons and Complaint to an officer, a managing or general agent or to any other agent authorized by appointment or by law to receive service of process. Alternatively, Betterr, LLC, may be served with process by servicing its registered agent, John Mecham, at 2437 E Cardinal Way, Salt Lake City, Utah 84121. Additionally, Betterr, LLC, may be served through the Office of the Texas Secretary of State at P.O. Box 12079, Austin, Texas 78711.

## III. JURISDICTION

11. The United States District Court for the Eastern District of Texas has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1338(a) (jurisdiction over trademark actions and copyright actions), 28 U.S.C. § 1338(b) (jurisdiction over unfair competition claim joined with a substantial and related claim under the trademark laws and copyright laws) and 15 U.S.C. § 1121(a) (jurisdiction over actions arising under the Trademark Act of 1946, 15 U.S.C. § 1051, *et seq.*). The Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a) because the state law claims arise out of the same operative facts as the federal claims.

12. This Court has personal jurisdiction over Defendant because Defendant has purposefully directed its activities to Texas and purposely availed itself of the privileges of conducting activities in Texas. A representative of Defendant telephoned a representative of Plaintiff to solicit Defendant's business to Plaintiff. Defendant provides online marketing services, such as search engine optimization (SEO) services. Plaintiff and Defendant entered into an agreement wherein Plaintiff paid One Thousand Dollars per month to Defendant for Defendant's online marketing services.

13. This Court has personal jurisdiction over Defendant because this litigation results from the injuries that Plaintiff has suffered that arise out of or relate to the activities associated with Defendant's availment. Defendant's online marketing activities included registering the domain name moldbustersdallas.com for Plaintiff and the transferring of control of that domain name as well as the domain name moldbustersftworth.com to Plaintiff. Defendant is now holding both domain names hostage until a ransom is paid, thus Defendant has violated the anticybersquatting consumer protection act. Further, Defendant is using Plaintiff's service mark MOLD BUSTERS FORT WORTH in Fort Worth, Texas, without Plaintiff's authorization, thus infringing on Plaintiff's rights in the mark. While Defendant performed online marketing services for Plaintiff, Defendant assist Plaintiff in securing and using that mark and obtaining the domain names. Now, Defendant is infringing on Plaintiff's rights in its mark and cybersquatting on the domain names.

## IV. VENUE

14. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because Defendant transacts business within this district and offers for sale goods and/or services in this district. Venue is proper because Defendant is subject to the personal jurisdiction of this Court in this district and thus qualifies as a resident of this district. In addition, Plaintiff has suffered harm in this district as a result of Defendant's actions and a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## V. AGENCY & RESPONDEAT SUPERIOR

15. Whenever in this Complaint it is alleged that Defendant did, or failed to do, any act, thing and/or omission, it is meant that Defendant itself or its agents, officers, servants, employees, vice principals, or representatives either did or failed to do such act, thing and/or

omission, and it was done with the full authorization or ratification of Defendant, and/or done in the normal routine, course and scope of the agency or employment of the Defendant or its agents, officers, servants, employees, vice principals, or representatives and/or with actual and/or apparent authority of the Defendant.

## VI. FACTS

16. Plaintiff provides high quality mold abatement services to homeowners and businesses in Fort Worth, Texas, and Dallas, Texas, including the surrounding areas. It services include water damage restoration, mold inspection, mold and air quality testing, mold remediation, reconstruction and renovation.

17. Plaintiff was formed in May of 2023. Plaintiff originally established its business in Dallas County, Texas, where it intended to focus its operation.

18. Plaintiff's business began to grow in the Dallas County market, establishing a customer base there. During this time, Plaintiff had begun using the mark AIRENSURED in connection with its goods and services.

19. Thus, Plaintiff established common law trademark rights in the mark AIRENSURED in the geographical area of the Dallas County market.

20. According to Defendant's website www.betterr.pro, Defendant advertises that it is a search engine optimization (SEO) and advertising agency as well as a web design and lead generation company.

21. More specifically, Defendant advertises that it provides, *inter alia*, lead generation services, search engine optimization services, website designing services and advertisement agency services.

22. According to Defendant's website, Defendant helps its clients' businesses to grow.

23. Upon information and belief, John Mecham ("**Mecham**") is an owner, director and/or officer of Defendant. According to a webpage on Defendant's website, namely, www.better.pro/team/, Mecham is the CTO of Defendant.

24. About the spring of 2024, Mecham, as a representative of Defendant, contact a representative of Plaintiff by telephone to solicit Defendant's services to Plaintiff, namely Defendant's search engine optimization (SEO) services and other marketing services. During the phone conversation, Mecham discussed using Defendant's marketing services to increase customer inquiries for Plaintiff and to grow Plaintiff's business.

25. During subsequent conversations between Plaintiff's representative and Mecham, Mecham encouraged Plaintiff to operate under the mark MOLD BUSTERS in connection with Plaintiff's goods and services rather than to continue marketing exclusively under the mark AIRENSURED.

26. Initially, Mecham and Plaintiff's representative discussed the possibility of a Carrollton, Texas, operation under the mark MOLD BUSTERS, which would align with Plaintiff's existing Dallas County business focus.

27. Subsequently, Mecham recommended, instead, that Plaintiff establish a Fort Worth, Texas, operation by using a) the domain name moldbustersftworth.com, b) a website that had been previously created for moldbustersftworth.com and c) a Google Business Profile that had also been previously created for moldbustersftworth.com.

28. Mecham told Plaintiff's representative that the domain name moldbustersftworth.com, the previously created website associated with domain name and the Google Business Profile associated with that domain name, all of which Defendant stated that it possessed and/or controlled, had been abandoned by its previous owner and were deteriorating.

Mecham stated that the previous owner of that domain name, website and Google Business Profile was no longer using them, thus Defendant intended to abandon them as well.

29. Further, Mecham told Plaintiff's representative that the previous owner of the domain name moldbustersftworth.com, who had been using the mark MOLD BUSTERS in Fort Worth, TX, was no longer using such mark in the area.

30. Also, per Plaintiff's own knowledge, no other business was using the mark MOLD BUSTERS in Fort Worth in the same or similar industry as Plaintiff at that time.

31. Mecham represented to Plaintiff that by using the abandoned domain name, abandoned website and abandoned Google Business Profile for its operation in Fort Worth, Plaintiff would grow its business faster than if Plaintiff registered a new domain name, created a new website and obtained a new Google Business Profile.

32. Plaintiff was initially hesitant with Defendant's advice because Plaintiff had already invested in the mark AIRENSURED and originally wanted to focus its business in Dallas County.

33. However, Defendant continued encouraging Plaintiff to pursue Fort Worth by taking over the abandoned domain name, website and Google Business Profile that Defendant had in its possession and/or control.

34. Mecham represented to Plaintiff that once Plaintiff took over the abandoned domain name, website and Google Business Profile, Plaintiff would own those assets. Further, Mecham discussed with Plaintiff's representative the eventual transfer of those assets to Plaintiff.

35. Based upon these representations, Plaintiff began operating in Fort Worth using the domain name moldbustersftworth.com, the website associated therewith and Google Business

Profile associated therewith, all incorporating the mark MOLD BUSTERS FORT WORTH (the "**Fort Worth IP**").

36. Defendant provided the Fort Worth IP so that Plaintiff could begin operating in Fort Worth under the service mark MOLD BUSTERS FORT WORTH.

37. Defendant made changes to the Fort Worth IP on behalf of Plaintiff, such as changes to webpages, address, etc. on the website and Google Business Profile associated with the Fort Worth IP, so that the information correctly reflected that a new business was associated with it, namely, Plaintiff's business.

38. At no time was there any discussion between Plaintiff and Defendant that Plaintiff was temporarily licensing a mark or business name or entering into a royalty arrangement with anyone.

39. Through, *inter alia*, the use of the Fort Worth IP, Plaintiff began using the mark MOLD BUSTERS FORT WORTH in Fort Worth, Texas, in connection with the mold abatement services that it offered, namely, water damage restoration services, mold inspection services, mold and air quality testing services, mold remediation services, reconstruction and renovation services.

40. Plaintiff has built goodwill in the mark MOLD BUSTERS FORT WORTH in Fort Worth. Thus, Plaintiff has common law trademark rights in the mark in Fort Worth and the surrounding area.

41. Plaintiff's mark MOLD BUSTERS FORT WORTH is distinctive. It is distinctive because the mark is arbitrary or suggestive in connection with Plaintiff's goods and/or services.

42. After encouraging Plaintiff to take over the Fort Worth IP and begin operations in Fort Worth under the mark MOLD BUSTERS FORT WORTH, Mecham recommend that Plaintiff establish operations in Dallas using the mark MOLD BUSTERS DALLAS. Mecham explained

to Plaintiff's representative that operating separate Dallas and Fort Worth websites and Google Business Profiles would help Plaintiff establish greater dominance in local search results. Mecham described the strategy as essentially Plaintiff competing with itself because both online presences would generate business for the same underlying company. This would allow Plaintiff to target customers searching for mold inspection services in Dallas and Fort Worth independently.

43. Per Mecham's recommendation, Plaintiff established a Dallas operation under the mark MOLD BUSTERS DALLAS alongside the Fort Worth operation that was operating under the mark MOLD BUSTERS FORT WORTH. For the Dallas operation, Defendant registered the domain name moldbustersdallas.com, created a website associated that domain name and created a Google Business Profile (the "**Dallas IP**"), all on behalf of Plaintiff.

44. Through, *inter alia*, the use of the Dallas IP, Plaintiff began using the mark MOLD BUSTERS DALLAS in Dallas, Texas, in connection with the mold abatement services that it offered, namely, water damage restoration services, mold inspection services, mold and air quality testing services, mold remediation services, reconstruction and renovation services.

45. Plaintiff has built goodwill in the mark MOLD BUSTERS DALLAS in Dallas. Thus, Plaintiff has common law trademark rights in the mark in Dallas and the surrounding area.

46. Plaintiff's mark MOLD BUSTERS DALLAS is distinctive. It is distinctive because the mark is arbitrary or suggestive in connection with Plaintiff's goods and/or services.

47. Per the discussions and agreement between Plaintiff and Defendant, the Fort Worth IP, which was abandoned and deteriorating, was promised to Plaintiff by Defendant, and Plaintiff began using the Fort Worth IP. Also, per the discussions and agreement between Plaintiff and Defendant, the Dallas IP was created for Plaintiff by Defendant, and Plaintiff began using the Dallas IP. Consequently, Plaintiff conducted its business through both its Dallas and Fort Worth

operation. Defendant was hired to develop and manage Plaintiff's online marketing presence, including the Fort Worth IP and Dallas IP.

48. The discussion and agreement made between Plaintiff and Defendant occurred through telephone calls and text messages. Plaintiff agreed to pay Defendant One Thousand Dollars ($1,000) per month for search engine optimization, marketing, website management and related services (collectively "**online marketing**"). The One Thousand Dollar payment per month was to compensate Defendant for the online marketing work that it performed for Plaintiff. Defendant's duties included managing domain names, websites and Google Business Profiles (i.e., the Dallas IP and the Fort Worth IP) to help generate customer inquiries for Plaintiff.

49. Furthermore, per the discussion and agreement, the Fort Worth IP would be transferred to Plaintiff, consistent with Mecham's representation that Plaintiff was taking over the abandoned domain name moldbustersftworth.com as well as the website and Google Business Profile associated with that domain name.

50. Additionally, per discussion and agreement, the Dallas IP would be transferred to Plaintiff.

51. Throughout the working relationship between Plaintiff and Defendant, Defendant controlled the Fort Worth IP and the Dallas IP. Defendant managed the search engine optimization (SEO), website updates and related marketing infrastructure. Defendant controlled the Google Analytics and Search Console accounts associated with the websites. Further, Defendant controlled the original Mold Busters telephone numbers that were associated with the previously abandoned website for moldbustersftworth.com. Defendant redirected telephone calls from that telephone number to Plaintiff. However, during this time, Plaintiff repeatedly requested that

Defendant display Plaintiff's phone number on the website instead of the previously used phone number.

52. During the time while Defendant managed the Fort Worth IP and Dallas IP for Plaintiff, Plaintiff invested resources, such as time and money, into developing and growing its business and into the mark MOLD BUSTERS FORT WORTH and into the mark MOLD BUSTERS DALLAS. The Fort Worth IP and Dallas IP became important sources of new business for Plaintiff. Plaintiff built good will in its marks and in its domain names.

53. During this time, Plaintiff continued paying Defendant one-thousand-dollars per month for Defendant's online marketing services.

54. On or about June 18, 2025, in accordance with the discussions and agreement between Plaintiff and Defendant, Defendant transferred a portion of the Fort Worth IP to Plaintiff, namely, ownership access of the Google Business Profile for the Fort Worth operation, thereby making Plaintiff the primary owner of that Google Business Profile (the Google Business Profile for the Fort Worth IP).

55. On or about July of 2025, Plaintiff changed Defendant's access to that Google Business Profile from owner to manager. After Plaintiff made that change, Defendant did not object nor request that its ownership access be restored. The transfer and change of access were consistent with the agreement that the Fort Worth IP be transferred to Plaintiff.

56. However, after the transfer of the Google Business Profile, the remaining assets of the Fort Worth IP, namely, the domain name moldbustersftworth.com and the associated website, remained under Defendant's control and neither asset had yet been transferred to Plaintiff. Plaintiff understood that these assets would be transferred from Defendant's control to Plaintiff at some point in time.

57. The transfer of the control of the domain name, website and Google Business Profile of the Fort Worth operation and of the Dallas operation were discussed by Plaintiff and Defendant throughout Plaintiff's business relationship with Defendant.

58. Mecham represented to Plaintiff that Plaintiff would take control of the Fort Worth IP as Plaintiff is the rightful owner of the Fort Worth IP, which includes the domain name moldbustersftworth.com, the associated website and the associated Google Business Profile.

59. As early as 2024, Mecham and Plaintiff's representative discussed the transfer of such assets, including on or about August of 2024.

60. In conversations via text message, Defendant agreed to transfer the Fort Worth IP and the Dallas IP to Plaintiff.

61. While Defendant agreed to transfer the Fort Worth IP and Dallas IP, time went by, and no transfer of control occurred.

62. On or about April of 2026, Plaintiff's representative again requested the transfer of control. Mecham responded that the process had been delayed and that he would work on completing the transfers.

63. On or about May 1, 2026, Plaintiff's representative and Mecham discussed domain name unlocking and authorization codes necessary to transfer the domain names for the Fort Worth IP and the Dallas IP.

64. Despite all the discussions as well as the agreement by Defendant to transfer the domain names, no transfer was completed by Defendant, except for the Google Business Profile for the Fort Worth IP as discussed above.

65. Then, in the Spring of 2026, in a telephone conversation between Plaintiff's representative and Mecham, Mecham demanded Twenty Thousand Dollars ($20,000) to transfer

the remaining Fort Worth IP, which includes moldbustersftworth.com, and the Dallas IP, which includes moldbustersdallas.com, to Plaintiff. Mecham explained that he did not believe that Defendant should have to give away something that Defendant owned for free.

66. When Plaintiff's representative heard this, Plaintiff's representative was surprised because this was inconsistent with the discussions, representations and agreement between Plaintiff and Defendant as Mecham had previously represented to Plaintiff that Defendant would provide to Plaintiff the previously abandoned domain name moldbustersftworth.com, the associated website and the associated Google Business Profile, and once Plaintiff began using them, which became the Fort Worth IP, Defendant would transfer control over such assets to Plaintiff. Further, during this time, Mecham had also represented that Defendant would transfer control of the Dallas IP to Plaintiff.

67. Plaintiff's representative declined to pay ransom for the assets. Plaintiff already owned them, and Defendant had already agreed to transfer the assets.

68. Once Plaintiff learned that Defendant was holding Plaintiff's intellectual property assets for ransom, Plaintiff terminated its business relationship with Defendant.

69. During the time that Defendant had been providing online marketing services to Plaintiff, Plaintiff had paid one-thousand-dollars per month to Defendant for such services.

70. On the day that Plaintiff terminated its business relationship with Defendant – but before the termination occurred, Plaintiff had sent a payment of one-thousand-dollars to Defendant. Later that day after the termination, Plaintiff's representative requested to Mecham that that payment be refunded to Plaintiff. Mecham acknowledged the refund request, but, to-date, has not returned the payment to Plaintiff.

71. Following the termination, Mecham sent Plaintiff's representative a text message stating that Defendant would not do anything to harm Plaintiff's business. Further, Mecham stated that the Defendant would keep the websites operational and would continuing forwarding leads to Plaintiff.

72. After Plaintiff terminated Defendant's services, Plaintiff noticed a significant change in customer inquiries coming from the websites for both the Fort Worth operation and Dallas operation. Before the termination, website contact form inquires had been delivered to Plaintiff. After termination, those inquires stopped arriving. Further, the original forwarded telephone numbers began producing spam calls instead of legitimate customer inquiries.

73. During this time, Plaintiff experienced a substantial decline in customer inquiries.

74. During this time, Defendant continued to maintain its control of the Fort Worth IP and the Dallas IP, holding them hostage unless Plaintiff paid Defendant twenty-thousand-dollars.

75. After Plaintiff terminated Defendant's services, Plaintiff purchased other domain names in an attempt to rebuild its online presence as Plaintiff was concerned about continuing to rely on Defendant when Defendant had already reneged on its promise to transfer the domain names and was now holding those domain names hostage for a ransom.

76. In August of 2026, an employee of Plaintiff submitted a test inquiry through the online contact form on the moldbustersftworth.com website. After that inquiry was submitted, Mecham contacted the employee – not knowing that that person was an employee of Plaintiff. When Mecham contacted Plaintiff's employee, Mecham identified himself with Defendant using the mark MOLD BUSTERS and attempted to schedule a mold inspection. This inquiry was never forwarded to Plaintiff. The conversation between Mecham and Plaintiff's employee was recorded.

77. Defendant is using Plaintiff's intellectual property, namely, the moldbustersftworth.com domain name with associated website as well as Plaintiff's mark MOLD BUSTERS to solicit customers in Fort Worth all the while holding the Fort Worth IP and Dallas IP, both of which are owned by Plaintiff, hostage until a ramson is paid to Defendant.

78. Thus, Defendant is offering mold abatement services to Fort Worth, TX, under the mark MOLD BUSTERS.

79. Consequently, Defendant is infringing on the common law trademark rights of Plaintiff in Fort Worth by using the mark MOLD BUSTERS in connection with mold abatement services without authorization from Plaintiff.

80. Further, Defendant is using the Fort Worth IP to divert customers from Plaintiff to Defendant.

81. On August 13, 2026, Plaintiff, through legal counsel, sent a written demand letter to Defendant, demanding that Defendant transfer to Plaintiff the Fort Worth IP and the Dallas IP, namely, the moldbustersftworth.com domain name, the moldbustersdallas.com domain name, the associated websites. Further, Plaintiff demanded the return of the payment that Plaintiff had submitted to Defendant on the date that Plaintiff terminated the services of Defendant along with a reimbursement of Plaintiff's attorney's fees.

82. On October 7, 2026, Mecham, on behalf of Defendant, responded in writing, a) refusing to transfer ownership of the Dallas IP to Plaintiff unless and until Plaintiff pays Five Thousand Dollars ($5,000) to Defendant and b) refusing to transfer ownership of the Fort Worth IP to Plaintiff because, according to Mecham, Defendant does not currently own the Fort Worth IP and has never owned the Fort Worth IP.

83. While Defendant in its October 7th letter states that it has never owned the Fort Worth IP and therefore cannot transfer it, Defendant had previously demanded Twenty Thousand Dollars ($20,000) for the transfer of the Fort Worth IP to Plaintiff.

84. Defendant's story is not believable: first, Defendant represented to Plaintiff that if Plaintiff began using the abandoned moldbustersftworth.com domain name, associated website and associated Google Business Profile, such assets will belong to Plaintiff, and Defendant will transfer those assets to Plaintiff. Then, Defendant holds the domain name and website hostage until Twenty Thousand Dollars ($20,000) is paid. Then, Defendant states that it cannot transfer the domain name and website because it never owned such assets.

85. Either Defendant never did own the abandoned moldbustersftworth.com domain name, associated website and associated Google Business Profile when Plaintiff engaged Defendant to perform online marketing services, in which case Defendant made material misrepresentations to Plaintiff about Defendant's ownership of such assets and Defendant's ability to transfer them such that Plaintiff relied on such statements to Plaintiff's detriment, resulting in damages to Plaintiff, or Defendant does own such assets as per its previous statements and is refusing to transfer such assets to Plaintiff, thus committing cybersquatting and breaching the agreement between Plaintiff and Defendant, resulting in damages to Plaintiff.

86. Further, Defendant is currently competing with Plaintiff in Fort Worth, TX, by offering mold abatement services in connection with the mark MOLD BUSTERS, thereby infringing on the common law trademark rights of Plaintiff in the mark MOLD BUSTERS and causing damage to Plaintiff.

87. Defendant's misrepresentations, breach of contract and/or refusal to transfer the Plaintiff's intellectual property, including the moldbustersftworth.com domain name and the moldbustersdallas.com domain name, have been material, intentional, willful and in bad faith.

88. Plaintiff, through counsel, requested the transfer of the Fort Worth IP and Dallas IP, but Defendant refused. Defendant is demanding $5,000 for the Dallas IP and is now refusing to transfer the Fort Worth IP, though it had previously demanded $20,000 for the Fort Worth IP. Defendant's actions, including holding the domain name hostage, have been malicious and in bad faith.

89. Further, Defendant is refusing to return the one-thousand-dollar payment to Plaintiff that Plaintiff provided to Defendant on the date that Plaintiff terminated their business relationship.

## VII. CAUSES OF ACTION

### *COUNT ONE: VIOLATION OF ANTICYBERSQUATTING CONSUMER PROTECTION ACT (MOLDBUSTERSFTWORTH.COM DOMAIN NAME)*

90. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

91. Defendant has committed cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d) in connection with the domain name moldbustersftworth.com.

92. Defendant registered, traffics in and/or uses the domain name moldbustersftworth.com, which is confusingly similar to Plaintiff's Mark MOLD BUSTERS FORT WORTH, a mark that is distinctive. Defendant has done so with a bad faith intent to profit from Plaintiff and Plaintiff's Mark.

93. Defendant has a bad faith intent to profit from the mark MOLD BUSTERS FORT WORTH.

94. Defendant has diverted, and has had the intent to divert, from Plaintiff's online location to a site accessible under the domain name that has harmed the goodwill associated with Plaintiff' mark for commercial gain.

95. Further, Defendant has offered to transfer, sell or otherwise assign the domain name to Plaintiff for financial gain, namely Twenty Thousand Dollars, without have used, or having an intent to use, the domain name in the bona fide offering of goods and services.

96. Additionally, Defendant has failed to maintain accurate contact information with the domain name registrar. The Defendant has refused to provide Plaintiff's contact information to the registrar even though Plaintiff is the rightful owner of the domain name.

97. Also, Defendant's prior conduct, namely, its misrepresentations to Plaintiff, indicate a pattern of bad faith conduct.

98. The use of the domain name by Defendant has been and is commercial in nature.

99. Thus, Plaintiff is entitled to recover Defendant's profits together with Plaintiff's damages, increased monetary recoveries as provided by the Lanham Act, as well as costs of the action and reasonable attorneys' fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

100. Additionally, pursuant to 15 U.S.C. § 1117(d), Plaintiff is entitled to statutory damages in an amount of not less than $1,000 and not more than $100,000.

101. Defendant's activities have caused and will continue to cause irreparable harm to Plaintiff for which Plaintiff has no adequate remedy at law.

102. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief, namely, an order directing that the registration of the domain name be transferred to Plaintiff or cancelled.

*COUNT TWO: VIOLATION OF ANTICYBERSQUATTING CONSUMER PROTECTION ACT (MOLDBUSTERSDALLAS.COM DOMAIN NAME)*

103. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

104. Defendant has committed cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d) in connection with the domain name moldbustersdallas.com.

105. Defendant registered, traffics in and/or uses the domain name moldbustersdallas.com, which is confusingly similar to Plaintiff's Mark MOLD BUSTERS DALLAS, a mark that is distinctive. Defendant has done so with a bad faith intent to profit from Plaintiff and Plaintiff's Mark.

106. Defendant has a bad faith intent to profit from the mark MOLD BUSTERS DALLAS.

107. Defendant has diverted, and has had the intent to divert, from Plaintiff's online location to a site accessible under the domain name that has harmed the goodwill associated with Plaintiff' mark for commercial gain.

108. Further, Defendant has offered to transfer, sell or otherwise assign the domain name to Plaintiff for financial gain, namely Twenty Thousand Dollars and Five Thousand Dollars, without have used, or having an intent to use, the domain name in the bona fide offering of goods and services.

109. Additionally, Defendant has failed to maintain accurate contact information with the domain name registrar. The Defendant has refused to provide Plaintiff's contact information to the registrar even though Plaintiff is the rightly owner of the domain name.

110. Also, Defendant's prior conduct, namely, its misrepresentations to Plaintiff, indicate a pattern of bad faith conduct.

111. The use of the domain name by Defendant has been and is commercial in nature.

112. Thus, Plaintiff is entitled to recover Defendant's profits together with Plaintiff's damages, increased monetary recoveries as provided by the Lanham Act, as well as costs of the action and reasonable attorneys' fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

113. Additionally, pursuant to 15 U.S.C. § 1117(d), Plaintiff is entitled to statutory damages in an amount of not less than $1,000 and not more than $100,000.

114. Defendant's activities have caused and will continue to cause irreparable harm to Plaintiff for which Plaintiff has no adequate remedy at law.

115. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief, namely, an order directing that the registration of the domain name be transferred to Plaintiff or cancelled.

*COUNT THREE: TRADEMARK INFRINGEMENT UNDER LANHAM ACT*
*(*15 U.S.C. § 1125(a)(1)(A))

116. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

117. Plaintiff's mark is MOLD BUSTERS FORT WORTH.

118. Defendant have committed and are currently committing trade mark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

119. This claim for infringement pertains to Defendant's use of the mark MOLD BUSTERS FORT WORTH.

120. Defendant is offering services relating to mold abatement services in Fort Worth, Texas, under the mark MOLD BUSTERS FORT WORTH.

121. Defendant's use of the mark is likely to cause confusion, mistake and/or deceive as to the affiliation, connection, and/or association between Plaintiff and Defendant or as to the origin, sponsorship or approval of Defendant's goods, services and/or commercial activities with Plaintiff's goods, services and/or commercial activities.

122. Defendant's unauthorized use of Plaintiff's mark infringes the rights that Plaintiff possesses in the mark and constitutes trademark infringement and unfair competition.

123. Defendant's infringement is willful and deliberate.

124. Accordingly, Plaintiff is entitled to recover Defendant's profits together with Plaintiff's actual damages, an increased monetary recovery, as well as costs of the action and reasonable attorneys' fees pursuant to Section 35(a) of the Lanham Act, 15 U.S.C. § 1117(a).

125. Defendant's activities have cause, are causing, and will cause irreparable injury to Plaintiff for which Plaintiff has no adequate remedy at law, in that: (i) Plaintiff's rights in the mark are unique and valuable property rights, which have no readily determinable market value, (ii) Defendant's infringement constitutes an interference with Plaintiff's goodwill and customer relationship and will substantially harm Plaintiff's reputation as a source of high quality goods and services, as well as harm the substantial value of Plaintiff's mark and (iii) Defendant's wrongful conduct and the resulting damages to Plaintiff are continuing and will continue in the future.

126. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116(a) and to an order under 15 U.S.C. § 1118 impounding all goods and other material in Defendant's possession, custody, or control that bear the Plaintiff's mark or infringing variations thereof.

127. Plaintiff also is entitled to, in addition to the other remedies described herein, the cost of corrective advertising and a reasonable royalty.

128. This is an exceptional case, further entitling Plaintiff to additional remedies and also entitling Plaintiff to recover its attorneys' fees and costs incurred in prosecuting this action and stopping Defendant's willful trademark infringement, pursuant to 15 U.S.C. § 1117.

*COUNT FOUR: TRADEMARK INFRINGEMENT UNDER TEXAS COMMON LAW*

129. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

130. To establish Texas common law trademark infringement, a plaintiff must prove a) that its use of its mark is distinctive; b) that it is the senior user of the mark and c) that the defendant's mark would be likely to confuse the public. *Thompson v. Thompson Air Conditioning & Heating, Inc.*, 884 S.W.2d 555, 558 (Tex. App.—Texarkana 1994, no writ).

131. If the harm resulted from a) fraud, b) malice or c) gross negligence, then a plaintiff is entitled to exemplary damages. Tex. Civ. Prac. & Rem. Code § 41.003(a). The recovery of exemplary damages is limited to the greater of either two times the amount of economic damages plus an amount equal to any non-economic damages, not to exceed $750,000, or $200,000. *Id.* at 41.008(b).

132. Defendant has committed and is currently committing service mark infringement, including unfair competition, in violation of Texas common law.

133. Plaintiff's mark is MOLD BUSTERS FORT WORTH.

134. Defendant is offering services in connection with mold abatement services in Fort Worth, Texas, under the mark MOLD BUSTERS FORT WORTH.

135. This claim for infringement and unfair competition pertains to Defendant's use of the mark MOLD BUSTERS FORT WORTH.

136. Plaintiff's Mark is distinctive and, therefore, legally protectable. Plaintiff's mark is arbitrary or suggestive in connection with its goods and/or services.

137. Plaintiff began using the mark before Defendant and, therefore, is the senior use of the mark.

138. There is a likelihood of confusion between the Plaintiff's mark and the mark that the Defendant is using. They are identical marks.

139. Therefore, Defendant has engaged in, and is engaging in, unfair competition by infringing upon Plaintiff's mark.

140. Consequently, Plaintiff is entitled to its lost profits and its actual damages.

141. Further, pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008, Plaintiff is entitled to exemplary damages in an amount no greater than either a) two times the amount of economic damages plus an amount equal to any non-economic damages, not to exceed $750,000 or b) $200,000.

142. Additionally, Plaintiff is entitled to preliminary and permanent injunctive relief.

## *COUNT FIVE: CONVERSION*

143. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

144. Conversion occurs when a person or entity makes an unauthorized, wrongful assumption and exercises dominion and control over the property of another to the exclusion of or inconsistent with the owner's rights. *Callaway v. Robert Lee State Bank*, No. 11-20-00047-cv, 2022 Tex. App. LEXIS 201, *11 (Tex. App.—Eastland Jan. 13, 2022, no pet.).

145. To establish a claim for conversion, a plaintiff must prove that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully

and without authorization assumed and exercised dominion or control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Id.* at *11, n.8. Also, the plaintiff must establish that he was injured by the conversion. *Id.*

146. If the conversion is willful, a plaintiff is entitled exemplary damages.

147. Plaintiff owned, had possession of and/or was entitled to possession of its property, specifically the Fort Worth IP and the Dallas IP. Defendant unlawfully and without authorization assumed and exercised dominion or control over such property to the exclusion of and/or inconsistent with Plaintiff's rights. Plaintiff demanded the return of the property. The Defendant refused to return the property.

148. Defendant's actions were willful.

149. Consequently, Plaintiff is entitled to actual damages, including the value of the property that was converted, and exemplary damages.

## *COUNT SIX: BREACH OF CONTRACT*

150. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

151. To establish a breach of contract, a plaintiff must prove the following: a) a valid contract; b) performance or tendered performance by the plaintiff; c) breach of contract by a defendant; and d) damages sustained by the plaintiff as a result of that breach. *Petras v. Criswell*, 248 S.W.3d 471, 477 (Tex. App.—Dallas 2008, no pet.).

152. Plaintiff and Defendant were parties to a valid and enforceable agreement. Plaintiff performed or tendered performance under the agreement. Defendant failed to comply with the

terms of the agreement, by, *inter alia*, not returning Plaintiff's property, specifically the Fort Worth IP and the Dallas IP. As a result of Defendant's breach, Plaintiff has sustained damages.

153. Therefore, Plaintiff is entitled to actual damages, consequential damages and incidental damages that resulted from Defendant's breach. Plaintiff's damages include loss of the Fort Worth IP and the Dallas IP.

154. Further, Plaintiff is entitled to specific performance.

*COUNT SEVEN: FRAUDULENT MISREPRESENTATION*

155. Plaintiff realleges and incorporates by reference the allegations above, namely, Paragraphs 16-89, as if the same were fully set forth herein.

156. To establish a claim for fraudulent misrepresentation, the following elements must be established: (1) the defendant made a representation to the plaintiff; (2) the representation was material; (3) the representation was false; (4) when the defendant made the representation, the defendant knew it was false or made the representation recklessly and without knowledge of its truth; (5) the defendant made the representation with the intent that the plaintiff act on it; (6) the plaintiff relied on the representation; and (7) the representation caused the plaintiff's injury. *Carroll v. Vivid Seats, LLC*, No. 3:25-CV-2904-G-BK, 2026 U.S. Dist. LEXIS 226074, at *12 (N.D. Tex. Sept. 10, 2026).

157. As discussed in the aforementioned fact section herein, Defendant made representations to Plaintiff that the Fort Worth IP was abandoned, that Plaintiff could use the Fort Worth IP, owned the Fort Worth IP and that Defendant would transfer control of the Fort Worth IP to Plaintiff and made representations that Plaintiff owned the Dallas IP and that Defendant would transfer control of the Dallas IP to Plaintiff.

158. These representations to Plaintiff were material because Plaintiff reasonably attached importance to and was induced to act based on the representations. Plaintiff continued to build goodwill in its business and its marks even though Defendant controlled the Fort Worth IP and the Dallas IP. Plaintiff was induced to act after hearing the representations because Plaintiff believe that Defendant would follow through and transfer control of the Fort Worth IP and the Dallas IP.

159. The representations made by Defendant were false. After Plaintiff terminated its business relationship with Defendant, Defendant asserts that it never owned the Fort Worth IP and therefore cannot transfer it to Plaintiff. Further Defendant is demanding money from Plaintiff for the transfer of the Dallas IP.

160. When Defendant made the representation, it knew that it did not own the Fort Worth IP. Defendant now asserts that the entire time it was providing online marketing services to Plaintiff, it was paying another party to license the Fort Worth IP.

161. The Defendant made the representations to Plaintiff with the intent that Plaintiff acts on them. To obtain Plaintiff as a customer, Defendant made the representations to Plaintiff. Plaintiff would not have become a customer of Defendant had Defendant told Plaintiff that Plaintiff did not own the Fort Worth IP and the Dallas IP and that such asserts could be transferred to Plaintiff.

162. Plaintiff relied on the representations made by Defendant. Plaintiff continued paying for Defendant's services each month with the anticipation that Defendant would transfer control of the Fort Worth IP and the Dallas IP to Plaintiff.

163. The representations caused injury to Plaintiff. While Plaintiff built goodwill in its marks and in the Fort Worth IP and the Dallas IP, Defendant is now refusing to transfer control.

Further, Plaintiff's goodwill is now being diverted to Defendant because Defendant is using the Fort Worth IP to solicit customers.

164. Consequently, Plaintiff is entitled to its actual damages and consequential damages resulting from the fraudulent misrepresentation. Further, Plaintiff is entitled to a constructive trust. Also, Plaintiff is entitled to exemplary damages.

## VIII. DAMAGES

165. As a result of the Defendant's actions, Plaintiff has incurred and/or will incur the following damages:

A. Reasonable and necessary attorneys' fees and costs in the proceedings before this Court, and those fees required for any appeal to the Court of Appeals, and thereafter to the Supreme Court.

B. Lost sales, lost profits and any other actual damages sustained by Plaintiff due to Defendant's unlawful conduct;

C. Statutory Damages;

D. Disgorgement of Defendant's profits;

E. Enhanced damages; and

F. Exemplary damages.

## IX. DEMAND FOR JURY

166. Plaintiff requests a jury trial of all issues in this action so triable.

## X. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant awarding the following relief:

A. A temporary restraining order, and thereafter preliminary and permanent injunction relief, enjoining and restraining Defendant, its officers, agents, servants, employees, successors, assigns, representatives and all persons in active concert or participation with it, from directly or indirectly:

    i. Using the mark MOLD BUSTERS FORT WORTH or any colorable imitation thereof in Fort Worth, Texas;

    ii. Using the mark MOLD BUSTERS DALLAS or any colorable imitation thereof in Dallas, Texas;

    iii. Using the Fort Worth IP

    iv. Using the Dallas IP.

B. An order directing Defendant to:

    i. Transfer the Fort Worth IP to Plaintiff; and

    ii. Transfer the Dallas IP to Plaintiff;

C. Compensatory damages in an amount to be proven at trial, including but not limited to, loss revenue, diverted sales, lost business operations, damage to goodwill.

D. Disgorgement of Defendant's profits.

E. Statutory damages.

F. Exemplary damages.

G. Treble damages and enhanced damages.

H. Plaintiff's reasonable attorneys' fees and costs

I. Pre-judgment and post judgment interest as allowed by law.

J. Costs of court and all taxable costs.

K. Such other and further relief as the Court deems proper and just in law or in equity.

Respectfully submitted,

/s/ *Aaron P. Peacock*

Aaron P. Peacock
State Bar No. 24060399
**PEACOCK LAW FIRM PLLC**
4131 N. Central Expressway, Suite 961
Dallas, Texas 75204
Telephone: (214) 617-1000
Facsimile: (214) 617-1010
Email: apeacock@peacockfirm.com

**ATTORNEY FOR PLAINTIFF**